**McDONNELL DOUGLAS CORPORATION,**
Appellee,

v.

**ISLAMIC REPUBLIC OF IRAN, The Ministry of Defense of the Islamic Republic of Iran and the Islamic Republic of Iran Air Force, Appellants.**

No. 84–1943.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1985.

Decided April 3, 1985.

Joseph McGlynn, Jr., Belleville, Ill., for appellants.

Thomas C. Walsh of St. Louis, Mo., for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and HANSON *, District Judge.

HEANEY, Circuit Judge.

The Islamic Republic of Iran, Ministry of Defense of the Islamic Republic of Iran, and Islamic Republic of Iran Air Force (collectively, Iran) appeal from an order of the United States District Court[1] granting McDonnell Douglas Corporation's motion for summary judgment in its declaratory judgment action against Iran. 591 F.Supp. 293. For reversal, Iran argues that the district court erred in (1) failing to hold that it lacked jurisdiction because of a forum selection clause in the contract between Iran and McDonnell Douglas which provides that contract disputes "should" be resolved through the Iranian courts; (2) denying Iran's motion to strike the affidavit of Lewis M. Johnson, Esq., McDonnell

Douglas's expert on current legal conditions in Iran, on the ground the affidavit was not based on personal knowledge and did not set forth such facts as would be admissible in evidence; and (3) granting McDonnell Douglas summary judgment because there allegedly are material facts in dispute. In a supplemental brief, Iran claims that sovereign immunity bars McDonnell Douglas's suit. For the reasons set forth below, we affirm.

## I. BACKGROUND.

In November, 1975, plaintiff-appellee McDonnell Douglas entered into a "Basic Ordering Agreement" (BOA) with the Imperial Iranian Air Force (IIAF) for the sale of certain parts for damaged F–4 aircraft.[2] The agreement extended for one year, and was subsequently renewed for three additional one-year periods in 1976, 1977 and 1978. It expired by its own terms in November 1979. Article XV of the BOA, entitled "Negotiation," states that: "Any difference or disputes from the execution of the contract that may not be settled amicably should be settled through Iranian courts." Article XVIII, however, specifies that the agreement is subject to United States laws, particularly those governing the export of arms. Article XIII, entitled "Force Majeure," provides that McDonnell Douglas is excused from any failure to perform or delay in performance arising from causes beyond its control, including acts of the United States Government and embargoes. Article X specifies that the IIAF shall bear the risk of loss of any ordered parts. Article XII stipulates that McDonnell Douglas's liability is limited to repair or replacement of defective parts and that "in no event will McDonnell Douglas Corporation be liable for consequential damages."

---

* The Honorable WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

2. As noted by the district court, the BOA only covered spare parts for certain crash-damaged or grounded F–4 aircraft. Iran could obtain routine spare parts and the repair of damaged F–4 parts only under a "Foreign Military Sales Agreement" with the United States.

Article VII provides that payments under the BOA shall be guaranteed by an irrevocable letter of credit established by the IIAF in the sum of at least $250,000, payable at First National Bank in St. Louis, Missouri. On November 22, 1978, the letter of credit expired and was never renewed. Thereafter, the First National Bank in St. Louis refused to make payments on McDonnell Douglas's invoices presented under the provisions of the BOA.[3]

In early 1979, the Imperial Government of Iran was overthrown by the Islamic Republic of Iran. Shortly thereafter, the United States Air Force ordered that no military parts be sent to Iran under the Foreign Military Sales Agreement. It also notified McDonnell Douglas that the designated shipper under McDonnell Douglas's Basic Ordering Agreement with Iran refused to ship military parts to Iran and directed McDonnell Douglas not to ship any Iranian Foreign Military Sales items to this shipper. McDonnell Douglas then suspended work on the only five orders pending under the BOA, and ordered the emergency evacuation of all McDonnell Douglas personnel from Iran by February 8, 1979. No additional orders were placed under the BOA after that date, and the IIAF officers who had administered the BOA were either arrested and killed or fled the country.

On August 31, 1979, McDonnell Douglas informed Iran by letter that it was unable to complete the five pending orders for F-4 parts because the designated shipper refused to make shipments to Iran and the First National Bank of St. Louis refused to make payments on the projects because Iran had not renewed its letter of credit as required by the BOA. McDonnell Douglas requested that Iran reinstate its letter of credit, and questioned whether Iran still desired the five orders. Iran did not respond.

Following the seizure of the American Embassy in Tehran in November, 1979, the Treasury Department blocked the transfer of any Iranian property to that country.

The State Department refused to issue any export licenses to McDonnell Douglas for sale of F-4 parts to Iran, and on December 5, 1979, suspended all existing licenses for export to Iran of F-4 spare parts.

In September 1982, McDonnell Douglas received a copy of a summons and complaint filed by the Islamic Republic of Iran in the Court of First Instance in Tehran, Iran. The complaint alleges that McDonnell Douglas breached the BOA by refusing to fulfill "approximately 40 orders" for parts submitted to McDonnell Douglas under the BOA in 1977. In addition, it alleges that "some parts" were sent to McDonnell Douglas for repair and/or exchange in accordance with Article XII of the BOA and that McDonnell Douglas failed to perform as required under the contract.

Iran's complaint alleges that McDonnell Douglas's breach of contract caused a shortage of F-4 parts and that Iran was therefore unable to fly aircraft in the Iran-Iraq war. The complaint seeks $6 million in damages, with the "real amount of damages" to be determined by an expert or group of experts in Iran. It also demands specific performance of the BOA, return of the parts, plus costs, attorney's fees, and fees for the damage experts.

On December 17, 1982, McDonnell Douglas filed this action in the Eastern District of Missouri seeking a declaratory judgment that it had not breached the BOA and that the Iranian proceedings were a nullity. The Iranian defendants filed a motion to dismiss, alleging lack of jurisdiction and sovereign immunity. The district court denied this motion. McDonnell Douglas thereafter filed a motion for summary judgment, together with extensive supporting affidavits, BOA records and copies of documents originally submitted by the United States to the Iran-United States Claims Tribunal at the Hague. Five months later, Iran submitted its motion in opposition, supported solely by one affidavit on current legal conditions in Iran and a

---

**3.** Although not an issue in this case, McDonnell Douglas alleges that Iran still owes $500,000 for parts shipped under twelve of its thirty-nine orders under the BOA.

telex from Iran's then-Minister of Defense, claiming that McDonnell Douglas should be required to prove its claim of performance and "the name of persons who have taken delivery of the said parts."

The district court determined that "[d]efendants have failed to establish a genuine issue of material fact to rebut plaintiff's evidence" and entered summary judgment for McDonnell Douglas. The court's lengthy and thorough opinion first held that under Article XVII of the BOA, and controlling principles of law, the BOA must be interpreted under the laws of the United States, and particularly, the law of the State of Missouri. It then held that jurisdiction in Missouri for McDonnell Douglas's suit was proper, notwithstanding the BOA's "negotiation" clause providing that contract suits "should" be resolved in the courts of Iran, because that clause is "clearly not a mandatory forum selection clause but instead states merely a forum preference. Second * * * even if the clause were considered mandatory, it would not be enforceable because of the changed circumstances in the forum state." The court then held that it was clear from the evidence that McDonnell Douglas had fully performed all of its contractual obligations under the BOA, and that even if it had not, any nonperformance was excused under Article XIII of the BOA because several events, including Iran's breach of contract in terminating the letter of credit necessary for paying McDonnell Douglas, made delivery to Iran of spare F-4 parts after November 1978 unnecessary, and subsequently, both impossible and illegal. The court also determined that Iran's claim for consequential damages was specifically prohibited by Article XII of the BOA, and that, in any event, consequential damages resulting from the loss of use of military aircraft in a war would be too speculative to be cognizable.

## II. DISCUSSION.

Iran's initial contention is that the district court erred in holding that it was not divested of jurisdiction by Article XV of the BOA which provides that contract disputes "that may not be settled amicably should be settled through Iranian Courts." Iran relies on *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), and *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), which hold that "absent some compelling and countervailing reason," *The Bremen*, 407 U.S. at 12, 92 S.Ct. at 1914, a forum selection clause between parties of equal bargaining power contained in a privately negotiated contract should be enforced by the courts.[4]

In our view, these cases do not compel a finding that the district court was ousted of jurisdiction by the BOA's forum selection clause. First, even if we assume for purposes of argument that the BOA's forum selection clause is mandatory, there is a "compelling and countervailing reason" why the forum clause should not be enforced. In *The Bremen*, the Court held that even a mandatory forum clause does not oust a non-forum court of jurisdiction if the party can "show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practicable purposes be deprived of his day in court." 407 U.S. at 18, 92 S.Ct. at 1917. The Court found it significant that the forum court, the London Court of Justice, met appropriate "standards of neutrality." The district court in the case at hand was persuaded by McDonnell Douglas's affidavit from Lewis Johnson, an attorney who lived in Iran from 1960 to 1979 and was a partner in a Tehran law firm from 1973 to 1979, that McDonnell Douglas could not receive a fair day in court in Tehran's Islamic Court of First Instance. Johnson's affidavit was based on his experience in

---

**4.** *The Bremen* Court specifically limited its holding to federal district courts sitting in admiralty, 407 U.S. at 10, 92 S.Ct. at 1913, and the holding in *Scherk* only concerned an *arbitration* forum clause. McDonnell Douglas has not, however, argued that these cases are inapplicable to this international contract dispute and we assume for purposes of argument that they are controlling.

Iran, several articles in journals and newspapers, and the report submitted to the Iran-United States Claims Tribunal at the Hague by Noel Coulson, Professor of Oriental Laws at the University of London.

McDonnell Douglas now argues that we need not rely on the Johnson affidavit because we should take judicial notice that it could not, at the present time, receive a fair day in court in Iran. McDonnell Douglas points out that several courts have recently taken judicial notice that an American corporation cannot, for all practicable purposes, receive a fair day in court in the Islamic courts in Iran. In *Rockwell International Systems v. Citibank*, 719 F.2d 583 (2d Cir.1983), the Court refused to enforce a contractual provision stipulating that disputes "must be settled in accordance with the rules and laws of Iran via referring to the competent Iranian courts." Viewing the forum clause as mandatory, the Court nevertheless held "[n]either [party] argues that the post-revolutionary Iranian judicial system is capable of affording an adequate remedy; courts that have passed on this contention have consistently rejected it." *Id.* at 587–88. *Accord Harris Corp. v. National Iranian Radio and Television*, 691 F.2d 1344, 1357 (11th Cir. 1982); *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854, 861 (S.D.N.Y.1983); *Itek Corp. v. First National Bank of Boston*, 511 F.Supp. 1341, 1349 (D.Mass.1981), *vacated and remanded on other grounds*, 704 F.2d 1 (1st Cir.1983); *American International Group v. Islamic Republic of Iran*, 493 F.Supp. 522, 525 (D.D.C.1980), *vacated on other grounds*, 657 F.2d 430 (D.C.Cir.1981); *Stromberg-Carlson Corp. v. Bank Melli Iran*, 467 F.Supp. 530, 533 n. 2 (S.D.N.Y.1979).

■ The parties at oral argument noted that Iran and the United States have not reestablished diplomatic relations. Additionally, we take judicial notice of the recent escalation of the war between Iran and Iraq, the bombing of Tehran by the Iraqi Air Force, Iraq's threat to shoot down all commercial planes over Iran, and the suspension of flights to Iran, by several commercial airlines, which would make it gravely difficult, inconvenient and dangerous for McDonnell Douglas to litigate its dispute with Iran in the Islamic Court of the First Instance in Tehran. We thus take judicial notice that litigation of the dispute in the courts of Iran would, at the present time, be so gravely difficult and inconvenient that McDonnell Douglas would for all practicable purposes be deprived of its day in court.[5]

■ Moreover, we are persuaded that *The Bremen* and *Scherk* are also distinguishable because the forum clauses at issue in both cases used mandatory language unlike the preferential word "should" used in the BOA. The towage contract at issue in *The Bremen* provided that "any dispute arising *must* be treated before the London Court of Justice." (Emphasis added.) The operative language in *Scherk* specified that controversies "shall" be settled by reference to a specified forum. We reject Iran's claim that the word "should" is, in the context of a contract, the equivalent of "shall" or "must." Iran cites no forum clause or contract case to this effect.[6] It rather relies on Missouri criminal and personal injury cases which hold that, in the context of a jury instruction, the words "ought, should, must and have can all function as verbal auxiliaries meaning to be bound." *State v. Bruton*, 383 S.W.2d 525, 529 (Mo.1964) (capitals omitted) (The court

---

5. Accordingly, we need not address Iran's argument that the district court erred in admitting the affidavit of Lewis Johnson because the affidavit is supportive of but not necessary to the resolution of the forum clause-jurisdiction issue.

6. Iran cites *Webster's New World Dictionary of the American Language, College Edition*, which points out that "should" is the past tense of "shall" and is "used in auxiliary function to

express duty, obligation, necessity, propriety or expediency." McDonnell Douglas points out that *Webster's Third International Dictionary* states that "should" is used "to express a desire or request," and that while "should" may express duty or obligation it also may signify "propriety or expediency." We conclude that *Webster's* gives support to Iran and McDonnell Douglas, and is thus inconclusive.

noted, however, that " 'must' is a stronger word because signifying compulsion or necessity." *Id.*); *State v. Rack,* 318 S.W.2d 211 (Mo.1958); *Williams v. Kaestner,* 332 S.W.2d 21, 27 (Mo.App.1960).

These cases are not persuasive. We find *Hubbard v. Turner Department Store Company,* 220 Mo.App. 95, 278 S.W. 1060 (1926), more to the point. There, the court held that, in the context of a contract dispute,

> [the] verb "should" has various shades of meaning. In its ordinary meaning it does not express certainty as the word "will" sometime does. * * * [In the context of the alleged contract in this case, it] is nothing more than an expression of opinion, with no definite assurance that such would be the result[.]

*Id.* 278 S.W. at 1061. *See also Cuevas v. Superior Court of Stanislaus County,* 130 Cal.Rptr. 238, 239, 58 Cal.App.3d 406 (1976) ("The word 'should' is used in a regular, persuasive sense as a recommendation, not as a mandate.")

That the parties intended "should" to be differentiated from "shall" is also suggested by the use of the word "shall" to describe the rights and duties of the parties in eighteen other clauses of the BOA. It is clear that the contracting parties recognized that, although disputes which could not be resolved amicably should be resolved in the courts of Iran, circumstances could arise which would make it too difficult and impracticable to require that all contract litigation be brought in the courts of Iran.

▌ Iran next argues that even if the district court had jurisdiction, it erred in granting summary judgment because there are disputed issues of material fact. We disagree. McDonnell Douglas submitted extensive documentary evidence that Iran made forty-three orders under the BOA, that four of these orders were cancelled by Iran and the remaining thirty-nine were fulfilled. This evidence also clearly reveals that the aircraft parts which the Islamic complaint alleges were sent to McDonnell Douglas for repair under the BOA were in

fact sent to McDonnell Douglas by the United States Air Force. Their repair and return was covered by a government-to-government foreign military sales contract between the United States and Iran. McDonnell Douglas thus had no contractual obligation to Iran with respect to these parts.

In an attempt to demonstrate that there were disputed issues of material fact, Iran relied solely on a telex from Iran's Minister of Defense which reiterated its claim that it never took delivery of the parts under the thirty-nine orders and that it had returned certain parts to McDonnell Douglas for repair but that the parts had not been returned. The district court held that the telex did not create a disputed issue of material fact because it did not set forth any evidence which supported its allegations. *See* Fed.R.Civ.P. 56(e).

We have reviewed the telex and the evidence introduced in opposition by McDonnell Douglas, and find that there can be no dispute that McDonnell Douglas fulfilled its contractual obligations under the BOA. The telex requests that McDonnell Douglas submit evidence to prove its claims of performance. McDonnell Douglas did this; the documents which it submitted in evidence clearly demonstrate that it fulfilled all thirty-nine orders under the BOA and that the parts sent to the United States for repair are not covered by the BOA but are covered by Iran's government-to-government military sales contract with the United States.

▌ Moreover, there are at least two other reasons why there can be no dispute that McDonnell Douglas did not breach the BOA. First, even if we assume a breach by McDonnell Douglas, and no breach by Iran, McDonnell Douglas was excused from performance by Article XIII of the BOA which excuses nonperformance "which arises out of causes beyond the control and without the fault or negligence of MDC. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the United States Government in either sovereign or contractual capacity * * * freight embargoes * *

[etc.]." We have already detailed the many occurrences which fall within the meaning of Article XIII, starting with the Iranian revolution in 1979 and culminating with the embassy takeover and the ban on F–4 spare parts shipments to Iran in late 1979. Second, because Iran breached the BOA by failing to renew the mandatory letter of credit after it expired on November 23, 1978, it is not in a position to seek enforcement of the agreement after that date by reason of its own nonperformance. *United States v. Penn Foundry & Mfg.*, 337 U.S. 198, 210, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949).

 Finally, even if McDonnell Douglas had breached the BOA, and Iran had not, the consequential damages prayed for by the Islamic complaint are precluded under Article XII of the BOA and this Article is enforceable because the limitation is not unconscionable, is in accord with the intent of the parties as to the allocation of risk, and the transaction was based in a commercial setting. *AES Technology Systems v. Coherent Radiation*, 583 F.2d 933, 939–40 (7th Cir.1978); U.C.C. § 2–719(3).

Iran's final argument is that the district court erred in refusing to hold that McDonnell Douglas's action is barred by sovereign immunity. McDonnell Douglas first contends that Iran has waived this issue by not raising it in its statement of issues on appeal or in its first appellate brief, and that, although this Court gave Iran permission to raise this issue in a supplemental brief, we reserved the question whether we would consider Iran's argument on its merits. Because we believe that it is important that Iran receive full and fair consideration of all its claims, we have decided to consider Iran's otherwise untimely sovereign immunity claim on its merits.

 The governing law is the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11 (1982) (FSIA). FSIA recognizes that sovereign immunity is the exception, rather than the rule, and should be confined to a foreign sovereign's truly governmental acts and not extended to strictly commercial activities. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S.

480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). Section 1602 provides that foreign nations are not immune "insofar as their commercial activities are concerned." Section 1605(a)(2) provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts in the United States or of the states in any case—
>
> \* \* \* \* \* \*
>
> (2) In which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

Section 1603(d) provides that

> [a] "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose.* (Emphasis added.)

The legislative history of FSIA specifically establishes that a transaction retains its commercial nature even though the purchasing government proposes to use the goods for military purposes:

> As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. *Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity.* The same would be true of a contract to make repairs on an embassy building. *Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.*

H.Rep. No. 94–1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad. News 6604, 6615 (emphasis added).

Several cases construing FSIA also make clear that a contract by a foreign government to buy equipment for its armed services constitutes a commercial activity to which sovereign immunity does not apply. *See e.g., Behring International v. Imperial Iranian Air Force,* 475 F.Supp. 383, 388–90 (D.N.J.1979) (actions of Iranian Air Force in contracting for freight forwarding services is commercial and not sovereign); *Texas Trading & Milling v. Federal Republic of Nigeria,* 647 F.2d 300, 309 (2d Cir.1981) (dictum) (contract by foreign government "for the sale of army boots" constitutes a "commercial activity"); *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 627, 641–42 (S.D.N.Y.1978).

Iran relies principally upon *Aerotrade, Inc. v. Republic of Haiti,* 376 F.Supp. 1281 (S.D.N.Y.1974) for its claim of sovereign immunity. Aerotrade, however, is a pre-FSIA case which followed the then-prevailing Second Circuit rule enunciated in *Victory Transport, Inc. v. Comisaria General,* 336 F.2d 354 (2d Cir.1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). *Victory Transport* had been construed as holding that an action against a foreign government concerning acts involving its armed forces was subject to a sovereign immunity defense. In *Texas Trading,* however, the Second Circuit specifically noted that FSIA had rendered the *Victory Transport* analysis obsolete and inaccurate:

> "*Dictum* in *Victory Transport, supra,* 336 F.2d at 359, and *Heaney v. Government of Spain,* 445 F.2d 501, 504 (2d Cir.1971), states that a contract made by a government for a public purpose, *e.g., bullets for the army,* is not 'commercial activity.' *This aspect of prior American law has been overruled by the FSIA, and the definition of 'commercial activity' has been concomitantly expanded to include such contracts.*"

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d at 310 n. 27 (emphasis added).

Thus, *Aerotrade* provides no support for Iran's argument.

Iran also relies on *International Association of Machinists v. Organization of Petroleum Exporting Companies,* 477 F.Supp. 553 (C.D.Cal.1979). On appeal, however, the Court of Appeals disagreed with the trial court's sovereign immunity analysis and affirmed only on an alternative basis under the act of state doctrine. *International Association of Machinists v. Organization of Petroleum Exporting Companies,* 649 F.2d 1354, 1358 (9th Cir. 1981).

■ In sum, the language of FSIA, its legislative history and recent case authority all confirm conclusively that the intent of the purchasing sovereign to use the goods for military purposes does not take the transaction outside of the "commercial" exception to sovereign immunity. Accordingly, the district court's rejection of Iran's sovereign immunity claim is affirmed.