IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 18, 2009

Charles R. Fulbruge III
Clerk

No. 08-50857
Consolidated with No. 08-51103

UNC LEAR SERVICES, INC., and
LEAR SIEGLER SERVICES, INC.,

Plaintiffs - Appellees

v.

KINGDOM OF SAUDI ARABIA, and
MINISTRY OF DEFENSE AND AVIATION
OF THE KINGDOM OF SAUDI  ARABIA

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before DAVIS, OWEN, and HAYNES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The dispute before us is between the Kingdom of Saudi Arabia and the Ministry of Defense and Aviation of the Kingdom of Saudi Arabia (Defendants - Appellants, collectively the "Kingdom") and UNC Lear Services, Inc., a domestic corporation, and its subsidiary, Lear Siegler Services, Inc. (Plaintiffs - Appellees, collectively "Lear").  The Kingdom appeals the following rulings by the district court: (1) denial of the Kingdom's motion to dismiss based on its claim of immunity under the Foreign Sovereign Immunities Act, (2) denial of the Kingdom's motion to dismiss based on its argument that the contracts between

the parties contain a mandatory forum-selection clause naming Saudi Arabia as the only available forum, and (3) denial of the Kingdom's motion to dismiss for forum non conveniens. For the following reasons, we reverse the district court's order denying the Kingdom's motion to dismiss based on sovereign immunity with regard to claims brought by Lear under one of the contracts (the TSP), and we affirm all other orders appealed from.

## I. Facts and Procedural Background

### A. Facts

The Kingdom maintains a fleet of F-5 aircraft as part of its air defense systems. It purchased these aircraft from the United States under the Peace Hawk Foreign Military Sales Program. Initially, the United States contracted directly with the Kingdom to provide support and maintenance for the fleet. The United States then contracted with third-party service providers such as Lear to fulfill the terms of those support agreements. In the mid-1990s, the Kingdom began entering into agreements directly with the third-party service providers to obtain maintenance and support for the fleet of aircraft.

In 1995, Lear and the Kingdom entered into the F-5 Spare Parts and Ground Equipment contract ("SPAGE"). Under this contract, F-5 parts and components that needed repair were shipped from Saudi Arabia to Lear in San Antonio. Lear inspected the parts to determine what repairs were necessary, and communicated the expected cost to the Kingdom. If the Kingdom approved the repairs at that cost, Lear solicited bids for the repairs, and once the repairs were complete returned the parts to Saudi Arabia. To pay for the repairs, the Kingdom funded an irrevocable letter of credit ("LOC"). The SPAGE contract required Lear to provide monthly updates to the Kingdom of the current amount available through the LOC. If the amount was below the amount necessary to cover expected shipments of parts, Lear was to promptly notify the Kingdom, at which time the Kingdom, at its discretion, could replenish the LOC. Lear in

2

turn was required to provide a performance bond to the Kingdom, also in the form of an LOC, equal to 5% of the contract value, or $1.2 million.

In 1996, the Kingdom awarded Lear a service contract, the F-5 Technical Support Program contract ("TSP"). Under the TSP, Lear sent hundreds of personnel to Saudi Arabia to provide training and support services to the Royal Saudi Air Force ("RSAF"). These employees were integrated with RSAF personnel, and provided training and support in post-ejection survival, photo reconnaissance, flight operations, tactics and weapons to the RSAF. They worked directly for and under the control of the RSAF. Lear employees were responsible for developing and coordinating emergency action procedures for the pilots of the F-5 aircraft. Others provided training to the RSAF in fighter weapons and tactics. As with the SPAGE contract, Lear was required to put up a performance guarantee bond for $5.6 million which represented 5% of the total cost of the contract. The Kingdom had the right to retain the bond until the contract was completed, and had the right to withhold the last payment due under the contract (to be no less than 10% of the total contract cost) until the contract was closed out. The final payment amount under the TSP was approximately $12.2 million, and Lear alleges the Kingdom has unjustifiably refused to pay this amount.[1]

Lear also alleges that in 1998, the Kingdom's LOC funding the SPAGE contract was depleted due to the Kingdom's failure to fund the LOC, and Lear had no mechanism to obtain payment for its services. After 1998, Lear alleges it worked with the Kingdom to prioritize repairs that needed to be made and that the Kingdom provided additional funds for these repairs. Lear also

---

[1] Lear also contends that the Kingdom coerced it into renting housing at the Al Bilad complex from a friend of the royal family at an exorbitant price. Lear seeks to recover the difference in amounts paid and the cost of other available housing. The Kingdom defends its nonpayment under the TSP contract by pointing to the failure by Lear to pay Saudi taxes that were due, and failure to deliver a certificate evidencing such payment.

cancelled some outstanding repairs and continued to store other parts. Lear accepted at least one additional shipment of parts after the LOC was depleted. The Kingdom maintains that Lear should have rejected all shipments after the LOC funds were insufficient to cover repairs.

When the SPAGE contract expired in 1999, Lear had a number of F-5 parts in storage in its San Antonio facility and continues to store these. Lear has received no payment for the storage costs. The Kingdom argues that Lear retained these parts as a gesture of goodwill, that Lear had no obligation to store the parts, and that the Kingdom has no obligation to pay for the storage. The Kingdom states that it instructed Lear to return the parts and Lear refused. Lear argues that the United States Air Force instructed the Kingdom that the parts could not be returned until the contract was properly terminated. Lear communicated this in a letter to the Kingdom in 2002.

In 2003 and 2004, Lear met with the Kingdom in an attempt to resolve their contractual disputes and close out both contracts. In particular, Lear complained of the following:

- The Kingdom improperly withheld the final payment due under the TSP contract, approximately $12.2 million, due to the alleged failure by Lear to pay taxes. Lear claims the Kingdom's argument that back taxes have not been paid is the result of the Kingdom's misrepresentation of Lear's income under the TSP contract to the taxing authority.

- The Kingdom improperly extended and eventually drew down Lear's $5.6 million performance bond under the TSP contract.

- The Kingdom's order that Lear rent an expensive housing complex shifted inordinate and unjustified expense to Lear. Lear was forced to comply or risk losing the TSP contract.

- Under the SPAGE contract, Lear has incurred significant uncompensated storage costs for storing the F-5 parts in its San Antonio warehouse.

The meetings between Lear and the Kingdom did not resolve any of these issues.

B. Procedural Background

In 2004, Lear filed this suit against the Kingdom in the Western District of Texas. Lear made claims under both the TSP and SPAGE contracts, alleging that the Kingdom breached both contracts in the manner stated above. The Kingdom moved to dismiss the suit on grounds that the contracts contained forum-selection clauses that required any litigation to take place in Saudi Arabia. The district court denied the motion, and determined that these clauses were permissive rather than mandatory forum-selection clauses. The Kingdom then moved to dismiss on the grounds of (I) sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), (2) for forum non conveniens, and (3) the act of state doctrine. The district court allowed jurisdictional discovery on the FSIA and forum non conveniens issues. After conducting a hearing and reviewing the evidence presented, the district court found that the Kingdom's actions under both contracts fell within the commercial activities exception of the FSIA, therefore subjecting the Kingdom to the jurisdiction of the district court. The district court also denied the motion to dismiss on grounds of forum non conveniens. It found that Saudi Arabia was an available and adequate forum, but determined that the public and private factors weighed in favor of Texas.

At the Kingdom's request, the district court certified for appeal to this court under 28 U.S.C. § 1292(b) the orders denying the Kingdom's motions based on the forum-selection clauses and for forum non conveniens. The Kingdom also appeals the district court's order denying its motion to dismiss based on its claims of sovereign immunity under the FSIA. The denial of immunity under

5

the FSIA is immediately appealable to this court and that issue is before us as well. The Kingdom also argues that the act of state doctrine bars American courts from considering the actions of the Saudi taxing authority and the Kingdom's actions related to the Al Bilad housing complex.

## II. Discussion

We consider below 1) whether the FSIA permits us to exercise jurisdiction over the Kingdom; 2) whether the forum-selection clauses in the contracts require us to yield to the Saudi forum; and 3) whether the district court abused its discretion in denying the Kingdom's motion to dismiss for forum non conveniens. For the reasons stated, we do not consider the Kingdom's act of state defense.

The issue of jurisdiction under the FSIA "is a question of law which this Court reviews de novo." Stena Rederi AB v. Comisión de Contrators del Comité Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de law República Mexicana, S.C., 923 F.2d 380, 386 (5th Cir. 1991). Lear argues that the district court's decision to treat the TSP and SPAGE contracts as related is a finding of fact and as such must be reviewed for clear error, however, "[c]ontract interpretation is a question of law which we review de novo." Kona Tech. Corp. v. S. Pac. Transp. Co., 225 F.3d 595, 609 (5th Cir. 2000). The district court's denial of the motion to dismiss for forum non conveniens is reviewed for an abuse of discretion. Dtex, LLC v. BBVA Bancomer, S.A., 508 F.3d 785, 787 (5th Cir. 2007).

A. Foreign Sovereign Immunities Act

The Kingdom argues that the FSIA precludes a United States court from exercising jurisdiction over these actions against it. The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Under the FSIA, "a foreign state is presumptively immune from jurisdiction of the United States

courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). Lear contends that it is entitled to bring this action against the Kingdom under the "commercial activity" exception to the FSIA. This exception is recognized under subsection §1605(a)(2) of the FSIA which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case– . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. §1605(a)(2). Lear contends that both the TSP and SPAGE contracts involved the purchase and sale of goods and services, and that they are commercial. Although Lear does not contend that the Kingdom acted in the United States, they argue that its purchase of goods and services under the contracts had a direct effect in the United States.

> Commercial activity is defined by the FSIA as:
>
> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

§1603(d). The Supreme Court provided a helpful explanation of the commercial activity exception in Republic of Argentina v. Weltover, 504 U.S. 607 (1992). There, it said:

> [W]e conclude that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign

sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce," Black's Law Dictionary 270 (6th ed. 1990). Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods. . . .

504 U.S. at 614-15.

In reviewing the district court's denial of the Kingdom's motion to dismiss under the FSIA, we must first consider Lear's argument that the SPAGE and TSP contracts must be read together as a single contract. We interpret a contract de novo, or as a question of law. Alliance Health Group, LLC v. Bridging Health Options, LLC, 553 F.3d 397, 399 (5th Cir. 2008). The district court concluded that the contracts were for the performance of closely related services and should be read together. We disagree.

In instances where documents are "executed at the same time, with the same purpose, and in the course of the same transaction, we construe the agreements together." Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1412 (5th Cir. 1993). Here, the contracts were entered into a year apart as the result of separate bidding processes. The two contracts are for the purchase of different goods and services and do not refer to each other. Moreover, the TSP contract contains a merger clause that states "This Contract embodies the entire agreement between the Government and Contractor relating to the Work, and the parties will not be bound by or be liable for any statement,

8

representation, promise, inducement or understanding of any kind or nature relating to the Work which is not set forth or provided for herein." Although performance under the two contracts may be related, the contracts were distinct and separate. Therefore, based on the language of the contracts, we decline to read the contracts together.

Turning to the Kingdom's contention that the TSP contract does not fall within the commercial activity exception, we agree. Employees under the TSP contract performed their work in Saudi Arabia and were integrated with the RSAF. Some of these employees provided flight operations services and training to the RSAF. Others trained the pilots in survival skills, including escape and evasion, and ejection over sea, desert, or mountain terrain. Employees also performed maintenance on the F-5 aircraft, minimizing the time the aircraft were unavailable for defense. Unlike a contract to buy army boots or bullets, as the Supreme Court discussed above, the TSP was a contract to provide personnel that were vital to the operation of a national air defense system. While the purpose of the TSP contract was undeniably sovereign, the nature of the contract was also sovereign. The TSP employees were integrated into the RSAF and can be considered military personnel. The legislative history from the FSIA instructs "the employment of diplomatic, civil service, or military personnel" is not commercial in nature. H.R. REP. NO. 94-1487, at 16 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6614, see Kato v. Ishihara, 360 F.3d 106, 111 (2nd Cir. 2004) (holding that employment of a public servant in the promotion of commerce was not in itself a commercial activity), Holden v. Canadian Consulate, 92 F.3d 918, 921 (9th Cir. 1996) ("Because private parties cannot hire diplomatic, civil service or military personnel, such hiring is necessarily governmental.").

In Butters v. Vance International, Inc., 225 F.3d 462 (4th Cir. 2000), the Fourth Circuit was called upon to determine whether the employment of a

security guard to protect a head of state constituted a commercial activity under the FSIA. There, the Saudi military did not allow the plaintiff to fill a particular guard position it deemed improper for a female. Id. at 464. The Fourth Circuit determined that guarding a head of state is a sovereign act, not one a private party could undertake. Id. at 465. "Indeed it is difficult to imagine an act closer to the core of a nation's sovereignty." Id. Maintaining an air defense system is a similarly sovereign act. Therefore, the subject matter of the TSP contract does not fall within the commercial activity exception of FSIA and we do not have jurisdiction over Lear's claim for breach of the TSP contract.

With respect to the SPAGE contract, however, we agree with Lear that it falls within the commercial activity exception to the FSIA. A foreign state undertakes commercial activity when it enters the marketplace and exercises "the same powers that a private citizen might exercise." Hond. Aircraft Registry, Ltd. v. Gov't of Hond., 129 F.3d 543, 548 (11th Cir. 1997). As the Supreme Court noted in Weltover, the purchase of army boots or bullets is a commercial activity. Here, the Kingdom entered the marketplace to obtain repair services for parts and components for its F-5 aircraft. Under this contract, damaged or defective aircraft parts were shipped from Saudi Arabia to San Antonio, where they were evaluated, repaired, and stored before being shipped back to Saudi Arabia. This is similar to the situation in McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341 (8th Cir. 1985). There, Iran contracted to buy parts from McDonnell Douglas for its F-4 aircraft. The Eighth Circuit stated that "a contract by a foreign government to buy equipment for its armed services constitutes a commercial activity to which sovereign immunity does not apply." Id. at 349. In determining that the contract to purchase F-4 parts was commercial activity, the Eighth Circuit concluded "that the intent of the purchasing sovereign to use the goods for military purposes does not take the transaction outside of the 'commercial' exception to sovereign immunity." Id.

We agree. The SPAGE contract for the repair and replacement of goods is a commercial activity, regardless of the product's end use for a military purpose. The SPAGE employees were not integrated with the RSAF, and therefore unlike the personnel working under the TSP contract, they cannot be considered military personnel.

The SPAGE contract is precisely the type of transaction the Supreme Court discussed in Weltover. There, it said "that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,'. . . a contract to buy army boots or even bullets is a 'commercial' activity." Weltover, 504 U.S. at 614. "[C]ourts typically hold that contracts for procurement of goods and services are commercial rather than governmental in nature." Walter Fuller Aircraft Sales, Inc. v. Republic of the Phil., 965 F.2d 1375, 1384 (5th Cir. 1992). In Texas Trading & Mill Corp. v. Federal Republic of Nigeria, 647 F.2d 300, (2nd Cir. 1981), the Second Circuit determined that a contract for the sale of cement from American companies to the Nigerian government was a commercial activity. Id. at 310. "Its purpose to build roads, army barracks, whatever [with the cement] is irrelevant." Id. Regardless of the end use of the F-5 components in aircraft that were used for national defense, the SPAGE contract was for goods and services and is properly construed as commercial activity.

But commercial activity by a sovereign alone is not enough to establish jurisdiction - the activity must also have a direct effect in the United States. "[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity." Weltover, 504 U.S. at 607. An effect of a contract is also direct when it is to be primarily performed in the United States. In Walpex Trading Co. v. Yacimentos Petroliferos Fiscales Bolivianos, 712 F. Supp. 383 (S.D.N.Y. 1989), an American company contracted with an instrumentality of Bolivia for the export of steel tubing and accessories. After partial performance, the Bolivian entity repudiated the contract, and the American company brought

suit. Id. at 385. The court concluded that where "[t]he performance of the contract was to occur primarily in [the United States], and the foreign defendant utilized United States banking resources to facilitate payment," there is a direct effect for purposes of the commercial activity exception. Id. at 390-91. On the other hand, where an American company sued the Federal Republic of Nigeria for the unlawful detention of and damage to its aircraft, the Second Circuit found there was no direct effect in the United States. Antares Aircraft, L.P. v. Fed. Republic of Nig., 999 F.2d 33, 36 (2nd Cir. 1993).

> However, in the instant matter, all legally significant acts took place in Nigeria. The aircraft was registered in Nigeria. There is no evidence that the use of the aircraft was related to substantial commerce with the United States. The detention of, and physical damage to, the plane happened in Nigeria. The alleged conversion thus occurred in Nigeria. Moreover, the negotiations over, and the payment of, the outstanding fees occurred in Nigeria and utilized Nigerian currency.

Id. The plaintiff argued that it paid the Nigerian fees from its bank account in New York, but the court determined this fact was "without legal significance." Id.

This court has held that significant financial harm suffered by an American company when a foreign government refuses to remit funds due under a commercial contract is a sufficient direct effect to meet this exception. In Voerst-Alpine Trading Corp. v. Bank of China, 142 F.3d 887 (5th Cir. 1998), this court found that an American company's "nontrivial financial loss in the United States in the form of funds not remitted to its account at a Texas bank" was a direct effect. Id. at 896. There, the Bank of China refused to honor a letter of credit that had been posted to pay for a shipment of goods. Id. at 890. Similarly in Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380 (5th Cir. 1999), an American company suffered financial harm after a Honduran public entity allegedly ousted its consultant from a sawmill operating in

Honduras in violation of a contract. While the court acknowledged the potential danger in treating the direct effect test expansively, it found the public entity's actions did have a direct effect in the United States as the entity "foresaw and perhaps even helped to plan the financial harms which occurred to appellees." Id. at 391.

The SPAGE contract was primarily performed in the United States. The Kingdom shipped parts to Lear in San Antonio, where Lear employees in Texas arranged for their evaluation, repair, and return. The place of payment was Houston, Texas. This is similar to the situation in Walpex Trading, where performance and payment under the contract both occurred in the United States and the contract was therefore considered to have a direct effect in the United States. Lear also suffered financial losses when the LOC was depleted and the Kingdom refused to pay for the repair or storage of the F-5 parts. When the LOC was depleted, Lear already had parts in its San Antonio facility and had repairs outstanding. It suffered additional financial harm when it continued to store (whether properly or not) the parts in its warehouse. Therefore, it is clear to us that the SPAGE contract had a sufficient direct effect in the United States so as to fall within the commercial activity exception of the FSIA.

B. Forum-Selection Clause

The Kingdom argues next that the SPAGE contract contains a forum-selection clause that requires this dispute to be heard in Saudi Arabia.[2] Mandatory forum-selection clauses that require all litigation to be conducted in a specified forum are enforceable if their language is clear. City of New Orleans v. Mun. Admin. Servs., Inc., 376 F.3d 501, 504 (5th Cir. 2004) ("For a forum selection clause to be exclusive, it must go beyond establishing that a particular

---

[2] The Kingdom argues for the first time on appeal that the law of Saudi Arabia should be applied to interpret the forum-selection clause. Because this argument was not made to the district court, we decline to consider it on appeal. Moreover, the Kingdom cites no Saudi law regarding contract interpretation that is different from United States law.

forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive."). The Kingdom argues that the SPAGE contract contains a mandatory forum-selection clause establishing the Board of Grievances (the "Board") in Saudi Arabia as the only forum available to settle disputes. Lear argues that the forum-selection clause is permissive, and the district court agreed with this interpretation. "We review conclusions of law - including contractual interpretations - de novo." Id. at 506. The clause in question from the SPAGE contract provides:

> 3.1 Any disputes that may arise from the application or interpretation of any of the provisions of this Contract or from any matter relating to the execution of any work entrusted to the Contractor and not resolved amicably by and between the Government and the Contractor, the Contractor, after being notified of the final decision of the Government regarding the subject under dispute, shall have the right to appeal to the Board of Grievances within thirty (30) days from the receipt of the Government's decision, otherwise it shall be considered as accepting said decision.[3]

Lear argues that this language does not clearly demonstrate the parties' intent to bind themselves to Saudi Arabia as the only available forum. Instead, it argues that the clause is permissive and allows jurisdiction to be exercised in

---

[3] The contract goes on:

> 3.2 The Contractor may not, because of such dispute, suspend work or any part thereof including the disputed part and it is always required to perform all work according to the Government's instructions until settlement of the dispute or the issue of a final decision by the Board of Grievances which shall be final and binding on the two parties.
>
> 3.3 The Contractor shall maintain full knowledge of the provisions of the Saudi Arabian Government Procurement Law and its executive by-law instructions which shall be applied to this Contract and its documents. These provisions are considered to take precedence whenever a contradiction occurs or when not specified, or if there is a contradiction between the implementation of the rules and the texts of the Contract and its documents. Ambiguity or confusion in the contract and its documents will be interpreted according to the terms of the law and implementation regulations.

Saudi Arabia, but does not rule out other possible forums. Assuming without deciding that the provision here is sufficiently clear to be mandatory, it is only applicable in situations where the Kingdom has issued a final decision. The Kingdom did not render a final decision on the issues of final payment and close out of the SPAGE contract. Lear contacted the Kingdom by letter in 2002 informing the Kingdom that the F-5 parts being stored could not be turned over until the contract was properly terminated as per instructions from the United States Air Force. The Kingdom did not respond to this letter and now argues that its lack of response should be construed as a final decision. It did not make this argument to Lear prior to this litigation, and Lear received no notice or indication that the Kingdom's silence constituted a final decision that triggered the thirty day appeal period. With no final decision of the Kingdom, the Board never became available as a forum. Moreover, if we accept the Kingdom's argument that the Board is the exclusive forum to resolve this dispute, Lear would be denied a remedy because the remedy the Kingdom points to in the SPAGE contract was never triggered.

C. Forum Non Conveniens

The district court also denied the Kingdom's motion to dismiss the case on the basis of forum non conveniens. We review this ruling for an abuse of discretion. Dtex, LLC, 508 F.3d at 787. In order for a case to be dismissed for forum non conveniens, there must be another forum that could hear the case, and therefore the first step in evaluating the motion is to "determine whether there exists an alternate forum." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981). This determination turns on the availability and adequacy of the forum:

> A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum. A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even

though they may not enjoy the same benefits as they might receive in an American court.

In re Air Crash Disaster near New Orleans, La., 821 F.2d 1147, 1165 (5th Cir. 1987) (en banc) (citations omitted), vacated on other grounds sub nom., Pan Am. World Airways, Inc. v. Lopez, 490 U.S. 1032 (1989), reinstated except as to damages by In re Air Crash Disaster near New Orleans, La., 883 F.2d 17 (5th Cir. 1989)(en banc).

The district court found that the Board was an available and adequate forum. Lear did not dispute that the Board was an available forum, and the district court focused its analysis on whether it was adequate. The district court had concerns regarding the fairness of the Board. Experts from both parties agreed that the Board does not give full weight to testimony given by women and non-Muslims, and considers testimony of Saudi nationals to be more credible than non-nationals. Despite these concerns, the district court did not find that the Board was an inadequate forum, and proceeded to the next step of the forum non conveniens analysis.

The district court determined that the private and public interest factors weighed in favor of Texas as a forum.

> The factors pertaining to the private interests of the litigants included the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." [Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)].

Piper Aircraft, 454 U.S. at 241 n.6. The district court determined that witnesses were located in both forums, and that translation of documents was unavoidable, regardless of forum. It also noted that many of the Kingdom's witnesses were fluent in English, while Lear's witnesses were not fluent in Arabic, making the United States a preferable forum. The district court acknowledged that Lear's

choice of forum was due some degree of deference. See Gilbert, 330 U.S. at 508 ("Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") In viewing these factors as a whole, the district court concluded that they weighed in favor of Texas as the forum.

The district court next considered the public interest factors.

> The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. [Gilbert, 330 U.S. at 509].

Piper Aircraft, 454 U.S. at 241 n.6. The district court acknowledged that neither forum was ideal for both parties and that some inconvenience was unavoidable. It also acknowledged that while both countries had an interest in trying the case, the United States, and Texas in particular, had a stronger interest.

We find no abuse of discretion in the district court's reasoning and conclusions, particularly with regard to the controversy regarding the SPAGE contract which is all that remains. The majority of activity under that contract took place in San Antonio, where the parts were evaluated and repaired by Lear employees, and continue to be stored there. The activity in Saudi Arabia was limited to Lear technicians employed under the TSP contract who removed the parts in need of repair and prepared them to ship.

The application of foreign law is another factor to consider, and while it has not yet been determined whether Saudi or American law is to apply to this dispute, the district court noted that federal courts have ably applied Saudi law in other cases. Based on these determinations, the district court concluded that the public interest factors weigh in favor of Texas as a more convenient forum.

The district court applied the proper law in evaluating the Kingdom's motion to dismiss for forum non conveniens. It first determined that Saudi

Arabia was an available and adequate forum, and then weighed the private and public interest factors and concluded that Texas was an appropriate forum.

> The forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.

Piper Aircraft, 454 U.S at 257. Here, the district court considered the relevant factors and acknowledged the difficulties presented by both possible forums. The focus of the analysis is on convenience, and the district court did not abuse its discretion in determining that Texas was a more convenient forum. See Dickson Marine, Inc. v. Panalpina, Inc., 179 F.3d 331, 342 (5th Cir. 1999).

### III. Conclusion

For the reasons set forth above, the district court erred in refusing to grant the Kingdom's motion to dismiss Lear's claims under the TSP contract. This makes it unnecessary for us to consider the Kingdom's act of state argument which relates to Lear's failure to furnish the tax certificates and Lear's claims for additional housing expenses caused by orders of the royal family. With regard to the claims related to breach of the SPAGE contract, the commercial nature of the contract and the direct effect of the contract in the United States bring it within the FSIA's commercial activity exception. The district court therefore correctly denied the motion to dismiss Lear's claims under the FSIA with regard to this contract. The grievance procedure outlined by the SPAGE contract was never triggered and did not become available to Lear so the district court correctly denied the Kingdom's motion to dismiss based on the forum-selection clause. The SPAGE contract's considerable connection with Texas and its continuing effects in that state, along with the other private and public interest factors demonstrate that Texas is an appropriate forum, and the

district court did not abuse its discretion in denying the Kingdom's motion to dismiss based on forum non conveniens.

We therefore AFFIRM the denial of the Kingdom's motions to dismiss Lear's claims with respect to the SPAGE contract. However, we REVERSE the district court's order denying the Kingdom's motion to dismiss Lear's claims under the TSP contract. We REMAND this case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part.

REVERSED in part and

REMANDED.