**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NYLA BUTTERS, an individual,
Plaintiff-Appellant,

v.

VANCE INTERNATIONAL,

No. 99-2184

INCORPORATED, a Corporation; VANCE
EXECUTIVE PROTECTION,
INCORPORATED; PAT BURKE; GREGG
HALL; DOES 1-100, inclusive,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-99-27-A)

Argued: June 6, 2000

Decided: September 11, 2000

Before WILKINSON, Chief Judge, MURNAGHAN,*
Circuit Judge, and Henry M. HERLONG, Jr.,
United States District Judge for the District of South Carolina,
sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Herlong joined.

_____

*Judge Murnaghan heard oral argument in this case but died prior to
the time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** Kevin Todd Barnes, LAW OFFICES OF KEVIN T. BARNES, Los Angeles, California, for Appellant. Douglas Bennett Mishkin, PATTON BOGGS, L.L.P., McLean, Virginia, for Appellees. **ON BRIEF:** Annette Kay Rubin, Leesburg, Virginia, for Appellant. Lisa A. Lavelle, Alyssa T. Senzel, PATTON BOGGS, L.L.P., McLean, Virginia, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellant Nyla Butters brought suit against her employer, Vance International, claiming that Vance discriminated against her on the basis of gender. The district court held that Vance was entitled to immunity from Butters' suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, because Vance's client, the Kingdom of Saudi Arabia, was responsible for Butters not being promoted. Finding no error, we affirm.

I.

Vance International, headquartered in Oakton, Virginia, provides security services to corporations and foreign sovereigns. In October 1994, Saudi Arabia hired Vance to augment the security provided to Princess Anud, a wife of Saudi King Fahad, while the Princess was undergoing medical treatments in California. The Saudi military was responsible for protecting Princess Anud. The Princess' residence in Bel Air, California was referred to as "Gold." Saudi Arabian Colonel Mohammed Al-Ajiji supervised all security at the site -- three Saudi military officers and the Vance agents. Saudi Captain Abdullah was second in command. The Saudi government paid Vance for its services.

In August 1995, Vance hired Nyla Butters as a part-time, at-will security agent. From 1995 until April 14, 1998, Vance assigned Butters to Gold for various extended periods. Butters served both as a

2

"resident agent" guarding various locations around the premises and as a "protectee agent" assigned to a particular member of the Saudi royal family. The chain of command among Vance agents at Gold was, from lowest to highest, resident agent, protectee agent, command post agent, and detail leader. On several occasions, Butters temporarily worked in Gold's command post.

In early April 1998, Vance supervisors at Gold recommended that Butters serve a full rotation in the command post. In Colonel Mohammed's absence, Captain Abdullah rejected the recommendation. When Colonel Mohammed returned, Gregg Hall, the Vance detail leader, spoke with Mohammed. Colonel Mohammed denied Hall's request for Butters to serve a rotation in the command post. Colonel Mohammed told Hall that such an assignment was unacceptable under Islamic law, and Saudis would consider it inappropriate for their officers to spend long periods of time in a command post with a woman present. This in turn could have political ramifications at home for the Saudi royal family. Mohammed also informed Hall that the Princess and her contingent wanted to speak only to male officers when they called the command post. In total, three Vance supervisors recommended Butters for the assignment. Saudi military officers denied every request.

On April 12, 1998, Hall told Butters that because of the Saudi decision, Butters could not be assigned a rotation in Gold's command post. Butters decided to leave Gold after her shift on April 14, 1998, and never return. As Butters left without giving Vance two weeks notice, her personnel record was updated with the notation "DNR," meaning that Vance would not call Butters for future work.

On May 28, 1998, Butters filed a charge of gender discrimination with the California Department of Fair Employment and Housing. On October 15, 1998, Butters filed suit against Vance in California state court. Vance removed the case on diversity grounds to the United States District Court for the Central District of California. The district court dismissed some of Butters' claims and, pursuant to a venue clause in Butters' employment contract, transferred the remainder to the Eastern District of Virginia. Butters' remaining claims were for discriminatory constructive termination, retaliatory constructive termination, and wrongful constructive termination in violation of public

3

policy under California's Fair Employment and Housing Act. Vance filed a motion for summary judgment with respect to these counts.

On July 30, 1999, the district court granted Vance's motion, finding Vance immune from Butters' suit under the Foreign Sovereign Immunities Act (FSIA). See 28 U.S.C. §§ 1602-1611 (1994). Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C.§ 1604. The district court held that derivative FSIA immunity attached to Vance because it was "acting under the direct military orders of Colonel Mohammed when [it] did not allow the plaintiff to work a full rotation in the command center." Butters appeals.

II.

Butters first contends that FSIA immunity does not attach to Vance because the action here was a "commercial activity." See 28 U.S.C. § 1605(a)(2). Section 1605(a)(2) provides,"A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . ." Id.

The FSIA defines "commercial activity" as"a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In Saudi Arabia v. Nelson, the Supreme Court stated,"a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (jure imperii), but not as to those that are private or commercial in character (jure gestionis)." 507 U.S. 349, 359-60 (1993). The Court elaborated on the distinction: "[A] state engages in commercial activity . . . where it exercises `only those powers that can also be exercised by private citizens,' as distinct from those`powers peculiar to sovereigns.'" Id. at 360 (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).

The relevant act here -- a foreign sovereign's decision as to how best to secure the safety of its leaders -- is quintessentially an act "pe-

4

culiar to sovereigns." See Nelson, 507 U.S. at 361 ("[A] foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature."). Indeed, it is difficult to imagine an act closer to the core of a nation's sovereignty. Providing security for the royal family in this country is not a commercial act in which the state is acting "in the manner of a private player within the market." Id. at 360 (internal quotation marks omitted); see also id. at 362 ("Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.").

One of the main concerns of the immunity framework adopted by the FSIA is to accommodate "the interests of foreign states in avoiding the embarrassment of defending the propriety of political acts before a foreign court." See Broadbent v. Organization of American States, 628 F.2d 27, 33 (D.C. Cir. 1980). These acts often have political, cultural, and religious components. Judicial interference with them would have serious foreign policy ramifications for the United States. We thus decline to require the Saudi government to justify to us the arrangements it believes are best suited to ensure the safety of its royal family.

III.

Butters next argues that Vance is not entitled to immunity since Vance, as opposed to the Saudi officials, was responsible for the decision not to promote Butters.

A.

If Vance was following Saudi Arabia's orders not to promote Butters, Vance would be entitled to derivative immunity under the FSIA. In Alicog v. Kingdom of Saudi Arabia, the Fifth Circuit affirmed a district court holding that agents enjoy derivative immunity when following the commands of a foreign sovereign employer. 860 F. Supp. 379 (S.D. Tex. 1994), aff'd, 79 F.3d 1145 (5th Cir. 1996). In that case, Saudi Arabia hired Majid Afifi, an American citizen, to work for Prince Saad during a visit to the United States. On orders from Afifi and the Saudi consul, the Prince's guards prevented two of the Prince's servants from leaving the hotel unless accompanied by an escort. See id. at 381. The servants sued Afifi, among others, for false

5

imprisonment. The court concluded that Afifi was immune from suit since "he merely repeated the prince's request that the plaintiffs not leave the [hotel] without the prince's permission and an accompanying guard." See id. at 384-85.

This conclusion did no more than recognize well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity. For instance, in Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18, 21-22 (1940), the Supreme Court held that sovereign immunity derivatively extended to a private contractor who, pursuant to a contract with the United States Government, constructed dikes that caused the erosion of the plaintiff's land. The Court held that because the contractor had not exceeded his authority under his valid contract with the United States, his acts amounted to "the act[s] of the government." Yearsley, 309 U.S. at 21-22.

Sovereign immunity exists because it is in the public interest to protect the exercise of certain governmental functions. This public interest remains intact when the government delegates that function down the chain of command. As a result, courts define the scope of sovereign immunity by the nature of the function being performed -- not by the office or the position of the particular employee involved. See Barr v. Matteo, 360 U.S. 564, 572-73 (1959) (plurality opinion). Imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work. As a result, courts have extended derivative immunity to private contractors, "particularly in light of the government's unquestioned need to delegate governmental functions." Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1448 (4th Cir. 1996); see also City of Worcester v. HCA Management Co., Inc., 753 F. Supp. 31, 37-38 (D. Mass. 1990) ("[P]ursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government.").

It is but a small step to extend this privilege to the private agents of foreign governments. All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions. This is especially true for foreign sovereigns given their lack of human

6

resources while operating within the United States. To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts. Under the circumstances here, imposing civil liability on the private agents of Saudi Arabia would significantly impede the Saudi government's sovereign interest in protecting its leaders while they are in the United States.

B.

Butters argues, however, that Vance, not Saudi Arabia, actually made the decision not to promote Butters. If this were the case, Vance would not be entitled to derivative immunity under the FSIA. As the district court correctly found, however, the evidence here establishes that the Saudi military officers, Colonel Mohammed and Captain Abdullah, decided not to promote Butters.

Three different Vance supervisors recommended Butters for a rotation in the command post. Their recommendations, however, fell on deaf ears. When one supervisor approached Captain Abdullah, who was in charge of Gold in Colonel Mohammed's absence, Abdullah stated that Butters could not be given a full command post rotation. When Colonel Mohammed returned, Vance supervisor Gregg Hall spent 45 minutes trying to convince the Colonel "that Nyla was the best person for the command post." Colonel Mohammed, however, did not budge.*

Butters has not sufficiently called into question Vance's position

_____

*Butters argues that the statements made by Colonel Mohammed and Captain Abdullah to the Vance supervisors constitute hearsay. Butters' argument, however, is misplaced. The statements made by these Saudi military officers are not offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Rather the significance of the statements is solely the fact that they were made -- i.e., that the Saudis were responsible for the fact that Butters was not promoted. Id.; see also 30B Michael H. Graham, Federal Practice and Procedure § 7005 (Interim ed. 2000) ("[T]estimony by an agent as to a statement by the principal granting him authority to act as agent is not hearsay. . . . Instructions to an individual to do something are also not hearsay.").

7

that Saudi Arabia was responsible for the decision not to promote her. First, Butters attempts to portray Patrick Burke, the Vice President of Vance, as the true decision-maker. Butters relies, however, on her own deposition testimony reporting an incident in which a Vance supervisor told Butters that Burke did not "trust" her. Not only is this statement hearsay, it also fails to contradict Burke's deposition testimony that he was unaware that Butters even wanted to work in the command post. Second, Butters relies on her deposition testimony that a junior Saudi officer informed her that he did not believe Colonel Mohammed was responsible for the directive. Again the statement is hearsay. In addition, no evidence suggests that this junior officer had any personal knowledge regarding why Butters was denied the assignment. As a result, Butters has failed "by affidavits or as otherwise provided in this rule, [to] set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

IV.

Any type of governmental immunity reflects a trade-off between the possibility that an official's wrongdoing will remain unpunished and the risk that government functions will be impaired. See Harlow v. Fitzgerald, 457 U.S. 800, 813-14 (1982) ("The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative."). FSIA immunity presupposes a tolerance for the sovereign decisions of other countries that may reflect legal norms and cultural values quite different from our own. Here Saudi Arabia made a decision to protect a member of its royal family in a manner consistent with Islamic law and custom. The Act requires not that we approve of the diverse cultural or political motivations that may underlie another sovereign's acts, but that we respect them. We thus affirm the judgment.

AFFIRMED

8