# United States Court of Appeals
## For the First Circuit

No. 12-2283

UNIVERSAL TRADING & INVESTMENT CO., INC.,
FOUNDATION HONESTY INTERNATIONAL, INC.,

Plaintiffs, Appellees,

v.

BUREAU FOR REPRESENTING UKRAINIAN INTERESTS IN INTERNATIONAL
AND FOREIGN COURTS; UKRAINIAN PROSECUTOR GENERAL'S OFFICE;
UKRAINE,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

David G. Hetzel, with whom Robert M. Shaw and Holland & Knight
LLP, were on brief for appellants.
Stephen F. Reardon, with whom Law Office of Stephen F.
Reardon, was on brief for appellee Universal Trading & Investment
Co., Inc.

August 12, 2013

**TORRUELLA, Circuit Judge.** We are asked to review a district court's assertion of jurisdiction over a matter involving a foreign sovereign, the Republic of Ukraine, and its agencies and instrumentalities (the "Ukrainian defendants"), following an alleged failure of those agencies and instrumentalities to pay for asset recovery work performed by a private entity, Universal Trading & Investment Co., Inc. ("UTICo"). Since we find that the Ukrainian defendants' transactions with UTICo constitute commercial activity exempt from immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, we affirm the district court's exercise of jurisdiction over UTICo's breach of contract claim.

## I. Background

The following facts are alleged in UTICo's complaint and were accepted as true by the Ukrainian defendants for the purposes of the motion to dismiss. In our review, we accept as true all well-pled facts alleged in the complaint and draw all reasonable inferences in UTICo's favor. Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011).

### A. Factual Background

Plaintiff UTICo is a Massachusetts corporation that engages in international asset recovery operations. Defendants Ukraine, the Ukrainian Prosecutor General's Office ("UPGO"), and the Bureau for Representing Ukrainian Interests in International

-2-

and Foreign Courts (the "Bureau") are charged in UTICo's complaint with a breach of contract for services UTICo allegedly rendered to them, but which remain uncompensated. This tale of international dimensions begins when UPGO turned to UTICo for assistance to recover assets expatriated from Ukraine by United Energy Systems of Ukraine ("UESU"), its principals (including former Ukrainian Prime Minister Pavlo Lazarenko ("Lazarenko") and Lazarenko's assistant, Petro Kiritchenko ("Kiritchenko")), and its parent company, United Energy International, Ltd.[1] UPGO is the prosecutorial agency in Ukraine, and the Bureau is responsible for paying and supporting foreign firms acting under contract in the interests of Ukraine. Both UPGO and the Bureau are agencies or instrumentalities of the Ukrainian government.[2]

The service agreements ("Agreements") between UPGO and UTICo at issue in this appeal arose in the context of UTICo's prior work investigating Cube, Ltd. ("Cube"), which was reorganized to

---

[1]  UTICo's complaint included other claims dismissed by the district court, namely, an additional claim for breach of assignment and claims for unjust enrichment, breach of fiduciary duty, negligence, and misrepresentation. The dismissal of those claims was not appealed.

[2]  While the Ukrainian defendants challenge the district court's description of UPGO and the Bureau as "agencies or instrumentalities" of Ukraine, arguing instead that they are political subdivisions of Ukraine, they concede that the distinction is irrelevant to the immunity analysis. Thus, for the purposes of our review here, we will treat all of the Ukrainian defendants as meeting the definition of "foreign sovereign." See 28 U.S.C. § 1603(a) (defining "foreign state" as including "political subdivision[s] of a foreign state").

become UESU. UESU, through the intervention of Lazarenko, had been awarded a lucrative government contract to handle the import of natural gas for distribution and delivery in Ukraine, and the proceeds collected by UESU for resale of natural gas had been converted through UESU's parent company accounts and then hidden in UESU's principals' secret accounts. In the course of UTICo's independent collection case against Cube/UESU, it uncovered evidence of Lazarenko's involvement in the control of UESU, and it had contacted UPGO and other Ukrainian agencies to report the uncovered fraudulent relationship. Ukraine's account agencies subsequently estimated that the total proceeds misappropriated from Ukraine by UESU amounted to over $2 billion. It was based on this and other of UTICo's discoveries that UPGO, in 1998, "expressed interest in contracting UTICo for continued investigation of the whereabouts of UESU-related assets and for the freezing of those assets, particularly those appropriated by Lazarenko, anywhere in the world that they might be found." Prior to its outreach to UTICo, the complaint alleges, UPGO had little success in its efforts to collect evidence in foreign jurisdictions in its investigations and prosecutions of Ukrainian nationals, most importantly in its attempts at asset recovery.

UTICo and UPGO reached their first agreement on May 15, 1998, when the Ukrainian Deputy Prosecutor General, Nikolai Obikhod, traveled to New York and discussed the terms of UTICo's

provision of its services with UTICo's representatives ("May Agreement").  That agreement stated as follows:

> Taking into account information and assistance that Universal Trading & Investment Co. is providing in regard to the activities of United Energy Systems of Ukraine (Ukraine, Dnepropetrovsk) and United Energy International Ltd. (London, U.K.), as well as its principals, shareholders, and the assets of the shareholders, the Prosecutor General's Office of Ukraine has agreed that Universal Trading & Investment Co. will be attributed a commission of 12 (twelve) percent on all and any above assets to be returned to Ukraine, in connection with the Power of Attorney of the Prosecutor General's Office of May 14, 1998.
>
> The Prosecutor General's Office of Ukraine confirms its commitment to engage for that the appropriate State bodies of Ukraine and to appropriately secure the permission for the above remuneration, taking into account that the remuneration is not payable from the State budget of Ukraine but from the assets to be repatriated to Ukraine from outside of Ukraine.

The Agreement was addressed to the President of UTICo, Y. A. Lambert, and bore the UPGO letterhead, including the Coat of Arms of Ukraine, as well as the signature of B. Ferents, the Acting Prosecutor General of Ukraine.  It was delivered to UTICo's office in Massachusetts.

According to the complaint, the May Agreement was executed as the "first framework agreement" that was followed by 14 additional contractual instruments between UTICo and UPGO.  The most prominent of these instruments is an agreement dated October 2, 1998, in which the newly confirmed Prosecutor General,

-5-

Mikhailo Potebenko, confirmed the May Agreement ("October Agreement"). That Agreement, also addressed to Y. A. Lambert as President of UTICo, states:

> With reference to our letter registered No. 12-01379-97 of May 15 of this year and the follow-up Powers of Attorney of August 5 and September 23 of this year, the present statement is to certify the previously agreed terms in regard to the unlawful assets outside of Ukraine of the Ukrainian citizens who illegally became the beneficiaries of PFG United Energy Systems of Ukraine and of United Energy International Ltd., and in regard to work on the return of such assets to Ukraine.

The October Agreement letter also bore the UPGO letterhead, including the Coat of Arms of Ukraine, and the signature of the new Prosecutor General. It was delivered to UTICo by Ukrainian officials during the Ukrainian Prime Minister's trip to Washington, D.C.

Other instruments included Powers of Attorney ("POAs") granted by UPGO to UTICo and/or attorneys selected by UTICo to pursue a series of investigations and actions on its behalf in multiple jurisdictions outside of Ukraine. Specifically, they granted UTICo and its selected attorneys authority to investigate and bring legal actions to reveal and secure the freezing of assets in a variety of jurisdictions, including, inter alia, the United States, the British Virgin Islands, the Bahamas, Panama, and Barbados. UTICo used these POAs to accomplish its asset recovery work on behalf of Ukraine.

-6-

UTICo claims that it was instrumental in freezing hundreds of millions of dollars for Ukraine through uncovering fraud engaged in by the principals of UESU and providing evidence vital to the prosecution of Lazarenko, Kiritchenko, and others. For example, it states in the complaint that it provided the evidence to UPGO that allowed UPGO to freeze $144 million of assets in the Balford Trust and an additional unknown amount of assets in the BL Trust maintained by Credit Suisse AG Bank in Guernsey, the Channel Islands, in 1998. It also allegedly provided evidence to UPGO allowing UPGO to freeze over $100 million of assets held in Eurofed Bank in Antigua, Lithuania, and Switzerland in 1999 and 2000. Further, UTICO claims it collected evidence in the Bahamas, Panama, Cyprus, Nauru, the Isle of Man, Jersey, St. Kitts, and the Cayman Islands, which UPGO then used to prosecute claims for stolen assets in excess of $1 billion in Ukraine.

**B. Procedural History**

On November 26, 2010, UTICo filed its complaint in the instant action. The Ukrainian defendants accepted UTICo's facts as true when they filed a motion to dismiss the complaint on grounds, inter alia, that they were entitled to immunity under the FSIA.

The district court denied defendants' motion to dismiss in part, allowing UTICo's breach of contract claim pertaining to the 1998 Agreements to go forward on grounds that jurisdiction could be asserted over that claim under the commercial activity

exception to the FSIA.  See Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts (Universal I), 898 F. Supp. 2d 301 (D. Mass. 2012).  Specifically, the court found that, while "the Agreement's language is ambiguous," and "extrinsic evidence will be necessary to establish the parties' intent," plaintiffs had stated a claim for breach of contract that was not jurisdictionally barred by the FSIA.  Id. at 314-16, 319-20.  In finding that the commercial activity exception applied to UTICo's breach of contract claim, the court stated:

> Ukraine hired an outside agent -- UTICo -- to engage in asset recovery on its behalf.  It is the contract between those two parties, and not the asset recovery itself, that is at issue in this case.  The contract between Ukraine and UTICo is not inherently governmental and does not address services that could be rendered to or provided by only a governmental entity.
>
> . . . .
>
> Ukraine . . . could have conducted its own asset recovery program.  Instead, . . . it chose to enter the marketplace, and contracted with UTICo in the same manner that a private company seeking to recover misappropriated assets would.  The underlying activity at issue -- the exchange of money for assistance in recovering misappropriated assets on an international scale -- is the type negotiated among private parties . . . .  Ukraine's attempt to lower the level of generality from a contract for the sale of asset recovery services to a contract for the sale of services to recover public assets impermissibly focuses on the purpose rather than the nature of the transaction.

Id. at 314-16 (emphasis in original).  The Ukrainian defendants timely appealed the court's immunity determination, and on April 4, 2013, the district court stayed proceedings pending this appeal. See Ungar v. Palestine Liberation Org., 402 F.3d 274, 293 (1st Cir. 2005) (appeal on grounds of foreign sovereign immunity permissible under collateral order doctrine).

## II.  Discussion

The Ukrainian defendants make three arguments on appeal, all relating to the applicability of the commercial activity exception to their sovereign immunity.  First, they contend that "the commercial act identified by the District Court in finding jurisdiction -- UPGO's alleged entering into a contract with UTICo -- did not occur," and thus, there was no particular transaction or act that could come within the definition of "commercial activity" under § 1603(d) of the FSIA.  Second, they challenge the district court's determination that the underlying conduct constituted commercial activity rather than sovereign activity, claiming that the court "conducted its jurisdictional analysis as though UTICo provided run-of-the-mill asset recovery services."  Instead, the Ukrainian defendants characterize the underlying contracted-for activity as assistance with a criminal investigation and asset forfeiture, and insist that when a sovereign contracts with someone to perform such "a uniquely governmental, non-commercial, service," the activity may not come within the commercial activity exception.

Finally, the Ukrainian defendants contend that UTICo's claim lacks the nexus to the United States required to establish jurisdiction under the commercial activity exception. We address each issue in turn.

## A. Applicability of the Commercial Activity Exception

The existence vel non of subject matter jurisdiction under the FSIA is a question of law reviewed de novo. Rodríguez v. Republic of Costa Rica, 297 F.3d 1, 5 (1st Cir. 2002). Since the Ukrainian defendants' first two arguments on appeal deal with whether the underlying conduct constitutes commercial activity, we consider them together.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Co., 488 U.S. 428, 439 (1998). It establishes a presumption of foreign sovereign immunity from the jurisdiction of the courts of the United States unless one of its enumerated exceptions to immunity applies. 28 U.S.C. §§ 1604, 1605, 1605A; Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488 (1983). Unless such an exception applies, courts in the United States lack both subject matter and personal jurisdiction over a suit against a foreign sovereign. 28 U.S.C. § 1330; Verlinden, 461 U.S. at 485 n.5.

Under the "commercial activity exception" to immunity, a foreign sovereign is not immune from jurisdiction where

the action is based [(1)] upon a commercial activity carried on in the United States by a foreign state; or [(2)] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [(3)] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

Section 1603(d) of the FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of the activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  The Supreme Court has noted that this definition "leaves the critical term 'commercial' largely undefined," and instead "simply establishes that the commercial nature of an activity does <u>not</u> depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct defines commerciality (i.e., nature rather than purpose), but still without saying what 'commercial' means." <u>Republic of Argentina</u> v. <u>Weltover, Inc.</u>, 504 U.S. 607, 612 (1992).  Nevertheless, the Court did state that,

when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. . . . [T]he question is not whether the foreign government is acting with a profit motive or instead with

-11-

the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."

Id. at 614 (citations omitted). The Court offered an example to highlight the distinction between commercial and sovereign activity:

a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods.

Id. at 614-15.

Further, the FSIA requires us to focus our commercial activity inquiry on the activities carried on "by the foreign state" upon which the civil action is based. 28 U.S.C. § 1605 (a)(2). Therefore, our inquiry will turn on "the particular actions that the foreign state performs," Weltover, 504 U.S. at 614, as opposed to the specific actions performed by the party with whom the foreign state contracted.

The First Circuit has not directly addressed the burdens of the parties with respect to an FSIA action. However, since the parties do not challenge the district court's adoption of the Second Circuit's burden-shifting framework, we adopt that framework here for the purposes of this case. See Universal I, 898 F. Supp.

2d at 309 (collecting cases showing that the Second Circuit framework is consistent with the burden-shifting framework in the Third, Fourth, Fifth, Seventh, Ninth, Tenth, Eleventh and D.C. Circuits).  For our purposes, then, having accepted that defendants fit within the definition of "foreign sovereign," the burden of production is on UTICo to offer evidence showing that, under one of the listed exceptions, immunity should not be granted to the Ukrainian defendants.  See Virtual Countries, Inc. v. Republic of S. Afr., 300 F.3d 230, 241 (2d Cir. 2002).  The ultimate burden of persuasion, however, rests with the foreign sovereign to show that none of the pertinent exceptions apply.  Id.  "Determining whether this burden has been met involves a 'review [of] the allegations in the complaint, the undisputed facts, if any, placed before [the court] by the parties, and -- if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue -- [resolution of] disputed issues of fact.'"  Id. (quoting Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 (2d Cir. 2001)).  Where the party asserting immunity does not contest the alleged jurisdictional facts, "but rather, challenges their legal adequacy, we review de novo the complaint's jurisdictional allegations to determine whether they were sufficient to eliminate the appellants' presumptive immunity."  Butler v. Sukhoi Co., 579 F.3d 1307, 1313 (11th Cir. 2009).

## 1. Particular Commercial Transaction or Act

We first consider whether UTICo met its burden of production in showing that a particular commercial transaction or act occurred. See Saudi Arabia v. Nelson, 507 U.S. 349, 356 (1993) ("We begin our analysis by identifying the particular conduct on which the [plaintiff's] action is 'based' for the purposes of the Act."). As we have noted in prior cases, "[t]he important question is whether [a sovereign] in fact contracted with the [plaintiff]." See Rodríquez, 297 F.3d at 6. In this circumstance, we examine whether the complaint sufficiently alleges UPGO's entry into contracts and then breach -- the commercial activity UPGO's action is "based upon" -- even occurred. The Ukrainian defendants carry the ultimate burden of persuasion that no exceptions to FSIA immunity apply. Virtual Countries, 300 F.3d at 241.

The Ukrainian defendants make three arguments challenging the existence of any contract on appeal. First, they claim that the POAs at issue did not empower UTICo, but only non-party lawyers, "presented to [UPGO] by UTICo."[3] Second, they contend

---

[3] Whether or not the POAs empowered UTICo itself, the May 14, 1998 POA was explicitly incorporated by reference into the May Agreement, and the August 5, 1998 and September 23, 1998 POAs were incorporated by reference into the October Agreement. Furthermore, an October 1999 submission by the Deputy Prosecutor of Ukraine, in which he stated that the "commission agreement" between UTICo and UPGO was "deemed fulfilled," stated that the April 30, 1999 POA "determined the subject and the scope of works that the entrusted party, the firm UTICo, was to undertake." Since UTICo's contract claim is based on these Agreements and the Ukrainian defendants' concession that UTICo had performed under them, it is therefore

-14-

that, since the Agreements were not signed by UTICo, they are at best unilateral contracts that are valid only if the offeree actually performed. Since, they claim, UTICo did not cause any assets to be repatriated to Ukraine, UTICo failed to make a showing that a contract in fact existed between itself and the Ukrainian defendants. Third, they directly challenge the district court's determination that UTICo's breach of contract claim stated a claim under Rule 12(b)(6) since the court found the Agreement's language to be "ambiguous." According to the district court, it was "not clear from the Agreement what constitutes a 'return' [of assets to Ukraine] -- such a return might require that the assets be transferred to Ukraine's bank accounts or it might require only that the assets simply be made available for Ukraine's collection." Universal I, 898 F. Supp. 2d at 319. Defendants assert that, without making a proper finding regarding UTICo's performance on the alleged unilateral contract, the district court erred in finding that UTICo had met its burden for Rule 12(b)(6) purposes in showing that a contract was formed.

We review de novo the district court's determination that a unilateral contract was formed. Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005). UTICo's proffered evidence of its contractual agreements with UPGO consists of the May and October Agreements as well as accompanying

based on these POAs as well.

-15-

and subsequently issued POAs.  Aside from the terms of the Agreements themselves, which reference UTICo's assent to agreed-upon terms,[4] the Agreements and POAs are signed by UPGO only. Therefore, they cannot properly constitute "an exchange of promises" as ordinarily understood under Massachusetts law, so they at best may be construed as offers for unilateral contracts.[5]  See United States v. Papaleo, 853 F.2d 16, 19 (1st Cir. 1998) (distinguishing an agreement that is an "exchange of promises" from a mere offer "for a unilateral contract").  Since the Ukrainian defendants' arguments are premised on their characterization of the Agreements solely as "offers," we move on to assess whether the complaint pleads their terms were accepted.

> Under Massachusetts law,
>
> That an offer for a unilateral contract is accepted by the act or acts of the offeree in accordance with the offer is not questioned . . . . [A]n acceptance of an offer must be in accordance with its terms, that is, by full performance by the offeree, in order that a contract may come into existence.

Northampton Inst. for Sav. v. Putnam, 313 Mass. 1, 7 (1943).

---

[4]  From the October Agreement: "[T]he present statement is to certify the previously agreed terms in regard to the unlawful assets outside of Ukraine of the Ukrainian citizens who illegally became the beneficiaries of PFG United Energy Systems of Ukraine and of United Energy International Ltd., and in regard to work on the return of such assets to Ukraine."  (emphasis added).

[5]  The parties apply Massachusetts common law to the contract claims in the briefing on appeal and in the briefing below.  See Universal I, 89 F. Supp. 2d at 318.

-16-

We first examine what would constitute acceptance based on the terms of UPGO's offer. The terms of the October Agreement, which confirmed the May Agreement, do not appear to place a clear obligation on UTICo to "return" assets to Ukraine in order to fully perform thereunder. Rather, the May Agreement lists UTICo's obligations in the first clause of its first sentence as providing "information and assistance . . . in regard to the activities of United Energy Systems of Ukraine . . . and United Energy International Ltd., as well as its principals, shareholders, and the assets of the shareholders." In return, the Agreement states, UPGO "has agreed that [UTICo] will be attributed a commission of 12 (twelve) percent on all and any above assets to be returned to Ukraine, in connection with the Power of Attorney of the Prosecutor General's Office of May 14, 1998." While the Agreement references returned assets to Ukraine, it appears to do so in terms of defining the compensation to be provided UTICo. However, we agree with the district court that, given the vagaries of the translation and the lack of definition of what might constitute a "return" under the terms of the Agreement, there remains some ambiguity as to what that term means. We thus rest with the district court's finding, concurring that the meaning of that term would surely benefit from the introduction extrinsic evidence.

As for evidence proffered to demonstrate UTICo's acceptance through performance, UTICo first points to a

-17-

September 15, 2003 letter from the Prosecutor General of Ukraine to the President of Ukraine, which demonstrates UPGO's recognition that UTICo had accomplished performance at least as to assets located and blocked in the banks of Guernsey, Antigua, and other countries. Further, as referenced supra, UTICo submitted a letter from Deputy Prosecutor Kudriavtsev to the President of Ukraine, filed with the Ukrainian municipal court, admitting the existence of a "commission agreement" by virtue of which:

> one side (the entrusted party) undertakes to act in the name of the other and at the expense of the other side (the entrusting party) undertaking certain legal actions. . . . The firm UTICo in accordance with the powers given to it embarked on accomplishing those works, it accomplished those works in the entire volume, by virtue of which under Article 42 of the Civil Code of Ukraine that agreement is deemed fulfilled.

Therefore, proffered evidence by UTICo indicates that a representative of UPGO acknowledged UTICo's full performance under the Agreements and POAs. Together with the other evidence offered, we can conclude for the purposes of our review on a motion to dismiss that sufficient facts have been pled indicating that a unilateral contract was formed.

### 2. Commercial Act or Sovereign Act

We next turn to the question of whether the underlying activity at issue in this case may be properly deemed "commercial" as opposed to "sovereign" or "governmental." In doing so, we are required to focus not on the purpose of the activity, but rather on

-18-

the nature of the course of conduct or particular transaction or act.  See 28 U.S.C. § 1603(d); Weltover, 504 U.S. at 612.  The underlying conduct at issue here can be characterized as UPGO's alleged contracting for UTICo's services and UPGO's alleged breach thereof.  Those Agreements, along with the POAs that followed them, indicate that the purpose of contracting for UTICO's asset recovery services is to "reveal, . . . establish the presence, and . . . secure the freezing [of assets] . . . as well as to accomplish the due measures for subsequent restitution and/or repatriation of illegally created assets to Ukraine."  The nature of UTICo's contracted-for services, as listed in the Agreements and POAs, included, inter alia, exchanging information and assistance, "conducting the investigation of a number of criminal cases," and "represent[ing] [UPGO] in various legal matters outside of Ukraine."

The allegations in the complaint indicate that UTICo's performance under the Agreements, taken on behalf of UPGO, were indistinguishable from ordinary asset recovery services.  UTICo's complaint states that it: met with various government officials regarding the fraud allegations against Lazarenko and Kiritchenko; secured discovery orders and obtained evidence about assets; applied for protective orders freezing assets; and submitted evidence it gathered to UPGO, which entity was then responsible for requesting foreign government issuance of subpoenas.  These

activities are actions that any asset recovery agent would perform while entrusted with a power of attorney, whether from a sovereign or a private party. Even if the final goal or purpose of the information and assistance was uniquely governmental -- prosecuting criminal conduct and repatriating stolen assets into a sovereign treasury -- the FSIA is clear that courts are not to determine the commercial character of an activity "by reference to its purpose." 28 U.S.C. § 1603(d).

Case law supports our construal of the underlying activity as commercial. In Weltover, the Supreme Court held that the Republic of Argentina was not entitled to immunity against a breach of contract claim brought by two corporations and a bank when Argentina unilaterally rescheduled the maturity dates on bonds issued to them. 504 U.S. 607. The Court reasoned that the issuance of bonds was a "commercial activity" because bonds were in almost all respects garden-variety debt instruments, and it was irrelevant why Argentina participated in the bond market as a private actor. Id. at 615-17.

Most relevant for our discussion here is the Court's elaboration of the distinction between the "nature" and "purpose" of commercial activity. On appeal, Argentina insisted that, even though a court is barred from considering an activity's purpose, it must nonetheless fully consider the context of a transaction in order to determine whether or not it is "commercial." Id. at 615.

-20-

The Court rejected that argument, stating that, "[h]owever difficult it may be in some cases to separate 'purpose' (i.e., the reason why the foreign state engages in the activity) from 'nature' (i.e, the outward form of the conduct that the foreign state performs or agrees to perform), the statute unmistakably commands that to be done."  Id. at 618 (citations omitted).  The nature of those activities are firmly defined as those powers not peculiar to sovereigns, but rather as "powers that can also be exercised by private citizens."  Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 704 (1976) (emphasis added).  Ordinary asset recovery services of the type described in UTICo's complaint are exactly the sort for which private citizens contract.

Further, the services for which the Ukrainian defendants contracted did not require UTICo to perform any governmental functions, they merely obligated UTICo to assist the Ukrainian defendants in later permitting those defendants to carry out governmental functions themselves.  Two Eleventh Circuit decisions are illuminating in this regard.  In Honduras Aircraft Registry, Ltd. v. Government of Honduras, 129 F.3d 543 (11th Cir. 1997), the Government of Honduras contracted with two plaintiff companies to assist it in upgrading and establishing a modern civil aeronautics program.  Under the contract, the plaintiff companies were given "the right to inspect commercial aircraft for certification in Honduras and to charge the aircraft owners a fee for that service,"

-21-

but only Honduras could perform the sovereign acts of actually admitting aircraft to its registry: "[The contract] provide[d] only that plaintiffs would provide the means and do the technical work so that Honduras itself could then register the aircraft in accordance with the contract." Id. at 546-48. Accordingly, the court characterized Honduras' activity as "ventur[ing] into the marketplace to find the expertise and resources needed to accomplish [sovereign] tasks," and "exercis[ing] its business judgment and contract[ing] in the marketplace with non-government companies to do and supply what it needed." Id. at 547. "Without plaintiff companies' private help," the court continued, "Honduras likely would not have had a new aircraft inspection and certification service." Id. Therefore, the court held that Honduras was acting as a private actor would as it "did not enter the technical assistance market to regulate that market as a sovereign, but to participate in it as an individual could." Id. at 548.

In a case even closer to the facts here, Guevara v. Republic of Perú, 468 F.3d 1289 (11th Cir. 2006), the Eleventh Circuit considered whether the Republic of Perú's offer of a reward in return for information enabling it to locate and capture the fugitive former head of Perú's National Intelligence System fell within the commercial activity exception to sovereign immunity. In that case, Perú, desperate for leads after an international manhunt

-22-

went stale, issued an emergency decree establishing a $5 million reward for accurate information enabling the authorities to locate and capture Vladimiro Lenin Montesinos Torres. Id. at 1293. Plaintiff Guevara had assisted Montesinos in Venezuela by providing him with a safe-house and a security detail; but he betrayed Montesinos' whereabouts to FBI agents in exchange for, he believed, immunity from federal prosecution and the high Peruvian monetary reward. Id. When Perú refused to pay, Guevara filed a lawsuit in Florida contending that Perú was not immune under the commercial activity exception. Id. at 1294. The district court dismissed his complaint on immunity grounds, and the Eleventh Circuit reversed, holding that the "underlying activity at issue -- the exchange of money for information -- is 'commercial in nature and of the type negotiable among private parties.'" Id. at 1299 (citing Honduras Aircraft Registry, 129 F.3d at 547). Specifically, the court found central the fact that

> Perú could have attempted to use its police and investigatory powers to search for Montesinos without offering money for information from anyone outside the government. However, Perú did not have the resources or expertise it needed to get the job done. After the trail ran cold, Perú ventured into the marketplace to buy the information needed to get its man. Guevara provided that information for a price, the price being the five million dollars that Perú had offered to pay for it.

Id. (internal quotation marks and citations omitted). The court sharply distinguished the roles of the sovereign from that of the

private party with whom it contracted by separating out the police powers and governmental functions retained by the former in the transaction:

> We think that information about a fugitive's whereabouts is to a war on crime as military supplies are to a more traditional war. Both commodities are useful to a state's performance of a sovereign function, but a contract for the purchase of either does not require the state to perform a sovereign function. In both situations performance of the contract by the private party enables the state to engage in a sovereign function if it wishes, but does not mandate that it do so. What it mandates is that the state pay the promised amount for the other party's performance. Paying an amount owed under a contract is not itself a sovereign act.

Id. at 1300. The court also rejected Perú's argument that Guevara was a mere "subrogee" or agent of the sovereign's authority performing a sovereign function, offering the following analogy: "If a bail bondsman offered a reward for information enabling the location and capture of a fugitive who had skipped out on a bond, he could not successfully defend a lawsuit seeking to collect on the reward by asserting sovereign immunity." Id. at 1301. The court went on to conclude, "[i]f an agent acting for the sovereign could not successfully claim sovereign immunity, the sovereign could not either." Id.

We find this reasoning most closely applicable to the facts alleged here. According to the complaint, the Ukrainian defendants had tried on their own to obtain the converted assets

absconded from the country at the hands of Lazarenko, Kiritchenko and others, and had failed in their own attempts. Defendants then entered into the marketplace to obtain information and assistance in recovering those assets, benefitting from the expertise and resources of professional asset recovery services like those UTICo brought to bear, and decided to contract with UTICo to accomplish those tasks in exchange for a commissioned amount. As in Honduras Aircraft Registry, the Ukrainian defendants "could have explored the possibility of hiring plaintiffs and plaintiffs' personnel as government employees," but instead, they "exercised their business judgment and contracted in the marketplace with non-government companies to do and supply what [they] needed." 129 F.3d at 547.

Further, UTICo was allegedly hired to provide the means and the technical work to assist in asset return and evidence gathering so that Ukraine itself could either return any assets found by UTICo into its treasury or prosecute the UESU principals, should it choose to do so. Just as was the case in Guevara, the Agreements here do not impinge on Ukraine's sovereignty because they do not force Ukraine's hand either way regarding the exercise of its police power over Lazarenko and Kiritchenko, nor do they require it to reappropriate any assets into the Ukrainian treasury that defendants decide not to reappropriate.

It is for these reasons that this case is distinguishable from the cases cited by the Ukrainian defendants. First, it is

distinguishable from dicta in In re Estate of Ferdinand Marcos Human Rights Litigation, 94 F.3d 539 (9th Cir. 1997), because, in that case, the underlying activity at issue was not the contracting for public asset recovery by a sovereign. Rather, the underlying activity involved the direct pursuit by a governmental agency of the Republic of the Philippines, under a statutory mandate, to recover property allegedly converted by the dictator Ferdinand Marcos, his wife, Imelda Marcos, and their associates, after the couple fled to Hawaii. Id. at 542, 546. In that pursuit, the agency utilized its full police power in its attempts to directly reappropriate the assets into the Republic's treasury. Id. at 546. Further, according to the allegations in the complaint, the assets in this case were not absconded from the Ukrainian treasury, but were rather alleged to have been received as illegal kickbacks from public enterprises in Ukraine. The determination of whether or not those assets in fact belonged within the Ukrainian treasury was one only a sovereign could make, and was a task UTICo was not contracted to perform.[6] In any event, to the extent In re Marcos

---

[6] There was extensive litigation in California in which UTICo attempted to recover assets in the San Francisco area from Lazarenko and Kiritchenko, pursuant to a purported assignment by UPGO to UTICo of its interest in this property. See Universal Trading & Inv. Co. v. Kiritchenko, 130 S. Ct. 3504 (Mem) (2010); Universal Trading & Inv. Co. v. Kiritchenko, 346 Fed. Appx. 232 (9th Cir. 2009); Universal Trading & Inv. Co. v. Kiritchenko, No. C-99-3073, 2008 U.S. Dist. LEXIS 51307 (N.D. Cal. June 16, 2008); Universal Trading & Inv. Co. v. Kiritchenko, No. C-99-3073, 2007 U.S. Dist. LEXIS 66317 (N.D. Cal. Sept. 7, 2007). While UTICo brought some claims in the present action based on this California

supports a different result than the one we reach here, we disagree with its analysis and decline to follow it.

The Ukrainian defendants attempt to liken this case to cases involving military personnel. We have no need to determine whether we will adopt a special "military personnel" rule as this case does not directly raise the issue and is distinguishable. In Butters v. Vance International, Inc., 225 F.3d 462 (4th Cir. 2000), the Fourth Circuit held that a private security company was entitled to derivative FSIA immunity from the Kingdom of Saudi Arabia in a gender discrimination suit. The facts underlying the case were that the plaintiff was allegedly discriminated against when a private company, at the direction of the Saudi government, refused to promote her into a command post. Id. at 464. The court characterized the underlying activity as "a foreign sovereign's decision as to how best to secure the safety of its leaders," which it held to involve a core police power. Id. at 465. Here, however, the contracted-for activity did not involve the direct protection of foreign dignitaries, nor are there any alleged facts alleging that the private party -- UTICo -- had been given by contract the types of police powers at issue in Butters: according

---

litigation, the district court dismissed all of those claims, see Universal I, 898 F. Supp. at 318-19, 323-24, and UTICo has not appealed from this dismissal. This case is therefore not based on the Ukrainian defendants' activity with respect to the California litigation, and we need not consider whether the activity alleged therein constitutes commercial activity under the FSIA.

-27-

to the complaint's allegations, UTICo personnel were not deputized, had no powers of arrest, were not armed as traditional security would be, and are not alleged to have had any law enforcement authority.  In fact, the allegations indicate that Ukraine had to step in at various points to perform functions only it could perform that the contractual agreement did not contemplate (for example, using evidence submitted to it by UTICo to request from the Bailiff (governor) of Guernsey the issuance of a subpoena to Credit Suisse for document production in relation to the asset recovery; using evidence obtained by UTICo to seek the detention of Lazarenko in Switzerland; using evidence obtained by UTICo to file an application to the Ukrainian parliament to strip Lazarenko of parliamentary immunity and for his arrest, etc.).

This case is likewise distinguishable from UNC Lear Services, Inc. v. Kingdom of Saudi Arabia, 581 F.3d 210 (5th Cir. 2009), where Saudi Arabia was held to be immune from an action alleging breach of a service contract with a private company to provide training and support services to the Royal Saudi Air Force ("RSAF").  There, the private employees performed their work in Saudi Arabia and were found to be so integrated with the RSAF as to be considered "military personnel."  Id. at 216.  The legislative history of the FSIA is clear that employment contracts with military personnel are not commercial in nature, H.R. Rep. No. 94-1487, at 16 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6614,

and the private service personnel under the facts of that case were indistinguishable from government personnel. Such are not the facts here, as discussed above.

It is for the same reasons that this case is also distinguishable from other government personnel cases cited by the Ukrainian defendants, including Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004) and the recent unpublished decision by the Ninth Circuit, Eringer v. Principality of Monaco, No. 11-56570 (9th Cir. July 10, 2013). In Kato, a civil service employee for the Tokyo Metropolitan Government sued her employer for sexual harassment and retaliation in violation of Title VII, attempting to assert a commercial activity exception on the basis that her employment activities involved the commercial promotion of Japanese companies in the United States. 360 F.3d at 109. The court held that the underlying activity at issue was not commercial in nature because it consisted in providing "general business development assistance, including product promotion, to business enterprises of [a] country seeking to engage in commerce in the United States." Id. at 114. Here, for the same reasons stated above, based on the complaint's allegations, UTICo can neither be characterized as a government employee nor was it contracted to provide services akin to those provided by the plaintiff in Kato. Specifically, the Ukrainian defendants, in contracting with UTICo, were allegedly not engaged in the process of regulating and promoting commercial activity in

-29-

a foreign country in relation to itself, but were rather entering into the marketplace in the United States to engage in commerce, contracting for specific services to assist in fields such as criminal prosecution and public asset reappropriation that they retained the ultimate power to regulate.

In Eringer, the plaintiff was the former Director of Monaco Intelligence Services and had assignments that only a government employee could perform -- "liaising with other intelligence agencies, investigating potential Government appointments, investigating suspicions of corruption and other illegal activity in Monaco, and protecting [Prince Albert II] from improper foreign influence." No. 11-56570, at *1. Eringer's facts, similar to those of Butters and Kato, are distinguishable from those alleged here for the same reasons those two cases are: UTICo employees can neither be characterized as government nor military personnel, and the underlying activity did not involve conduct that only a sovereign could perform. Nothing in the terms of the Agreements, the POAs or the alleged facts of UTICo's performance indicate that UTICo was either tasked with, had been given the authority, or had the capacity to perform the kinds of police-power activity that a director of an intelligence program working inside a government could perform, nor did Ukraine allow it to do so.

-30-

UTICo having met its burden of production on this score, we now turn to whether the Ukrainian defendants have made assertions at this stage to meet their burden, by a preponderance of the evidence, to show that UTICo's claims do not fall within the commercial activity exception. We find that they have not. The Ukrainian defendants make an assertion that no assets have been in fact "returned" to Ukraine. We have found that the actual return of assets was not clearly stated one of UTICo's performance obligations on the face of the October Agreement. The Ukrainian defendants have concentrated instead on the purpose of the agreements and the goal of its relationship with UTICo. Since we have found it impermissible to focus on the purpose rather than the nature of the underlying activity, we cannot find that the Ukrainian defendants have met their burden of persuasion here.

## B. Nexus to the United States

We now turn to the Ukrainian defendants' final argument: that UTICo's claim on its pleadings lacks the nexus to the United States required to establish jurisdiction under the commercial activity exception. For a court to exercise jurisdiction over a foreign sovereign under the commercial activity exception, the FSIA requires that some form of nexus be established between the sovereign's activity and the United States. As stated above, a nexus between a defendant's commercial activity and the United States may be shown under one of three circumstances under the

-31-

statute: (1) the activity was "carried on in the United States"; (2) the activity performed in the United States is "in connection with a commercial activity of the foreign state elsewhere"; or (3) the activity occurred "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The Act further defines "commercial activity carried on in the United States by a foreign state" as meaning "commercial activity carried on by such state and having substantial contact with the United States." Id. § 1603(e).

The Ukrainian defendants contend that the district court erred in not analyzing whether the pleadings in UTICo's surviving breach of contract claim pled a sufficient nexus with the United States to establish jurisdiction. The district court in fact did not consider the nexus requirement as mandated by the statute. In doing so here, we conclude that plaintiff alleges sufficient facts to support the nexus requirement for jurisdiction.

Having characterized the commercial activity at issue as the Ukrainian defendants' contracting for information and assistance in exchange for a commission, we begin by looking at the facts alleged pertaining to the Agreements and the POAs. The negotiations with UTICo's management and counsel pertaining to the Agreements are alleged to have occurred in the United States, all of the contractual instruments were directed to U.S. addresses in

Massachusetts, and those instruments were allegedly delivered in either Massachusetts or Washington, D.C., to representatives of a corporation organized under the laws of Massachusetts with its principal place of business in Massachusetts.

UPGO does not contest that the Agreements were delivered in the United States. However, it does point out in its briefing that "UTICo does not allege that either of the two letters on which [the breach of contract claim] is based were actually executed in the United States." Even if the Agreements were executed outside the United States, it is not dispositive as the Agreements were actually unilateral contracts. As such, we may look to where the unilateral contract was offered since it was the offer that in fact established a nexus or link between the Ukrainian defendants in this case and UTICo, and it was through that offer that the foreign sovereign engaged in commerce and officially entered the marketplace in the United States. Since the Ukrainian defendants do not dispute that both Agreements were delivered to UTICo within the United States, we conclude that UTICo alleged sufficient facts that the commercial activity at issue was "carried on in the United States." See also Guevara v. Republic of Perú ("Guevara II"), 608 F.3d 1297, 1307 (11th Cir. 2010) (finding insufficient nexus with the United States to establish jurisdiction where the offer of a reward for information enabling the capture of a fugitive constituted the commercial activity at issue in the case, but the

offer was published as an Emergency Decree in an official publication in Perú); <u>Santos</u> v. <u>Compagnie Nationale Air France</u>, 934 F.2d 890, 894 (7th Cir. 1991) (stating that an employment contract made in the United States for foreign employment provides jurisdiction for a claim for breach of that agreement since the plaintiff claims a breach of duty that arose within the United States).

We also note UTICo's submission to the district court of a declaration from its chairman, W. Scott Thompson, stating that the May Agreement was executed "[a]fter several months of negotiations including in New York in April of 1998." <u>See</u> <u>Terenkian</u> v. <u>Republic of Iraq</u>, 694 F.3d 1122, 1137 (9th Cir. 2012) (finding the nexus requirement satisfied where "substantial prior contractual negotiations . . . occurred within the United States."). The declaration further stated that "more than 90% of work" by UTICo in "implementing the 1998 Agreements" was "performed in Massachusetts." <u>See</u> <u>Zedan</u> v. <u>Kingdom of Saudi Arabia</u>, 849 F.2d 1511, 1513 (D.C. Cir. 1988) (citing H.R. Rep. No. 1487, 94th Cong., 2d Sess 17 (1976), as stating that the nexus requirement may be met in "cases based on commercial transactions performed in whole or in part in the United States.").

Even if we were to find that the Ukrainian defendants' alleged commercial activity was not "carried on in the United States," sufficient facts were alleged to establish a nexus based

on their activity "outside the territory of the United States in connection with a commercial activity . . . [that] causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Thompson's declaration indicates that the Bureau would have performed its obligations under the Agreements in Massachusetts: "UTICo's accounts payable concerning the Bureau (as well as any other accounts payable) have been in Massachusetts," so "[i]f the Bureau paid UTICo, the funds would have been received on its accounts in Massachusetts."  In Weltover, the Supreme Court discussed this third type of nexus as not requiring "substantiality" or "foreseeability" of effects in the United States, defining the effect required instead as "'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'"  504 U.S. at 618 (quoting Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2d Cir. 1991)).  The Court also noted that the sovereign defendants

> had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments.  Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming.

Id. at 619.

In addition, UTICo, as an American company, allegedly suffered significant financial harm when the Ukrainian defendants refused to remit the commission due under the Agreements, which creates a sufficient direct effect to meet the requirements of the exception.  See, e.g., Byrd v. Corporación Forestal y Industrial de Olancho S.A., 182 F.3d 380, 390-91 (5th Cir. 1999) (holding that an American company suffering financial harm after a Honduran public entity breached its contract created a "direct effect" sufficient for jurisdiction); Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 896 (5th Cir. 1998) (holding that an American company's "nontrivial financial loss in the United States in the form of funds not remitted to its account at a Texas bank" was a direct effect).  We therefore find that UTICo has put forward sufficient facts to establish a nexus with the United States, and the district court did not err in asserting jurisdiction over this case.  Since the Ukrainian defendants put forward no additional facts beyond those contained in UTICo's complaint and affidavits regarding nexus, but rather point to the significant international asset recovery work UTICo performed, we cannot find that they have met their burden of persuasion by a preponderance.  UTICo's alleged international recovery work, while substantial, is not the focus of our inquiry.  Instead, we focus on the Ukrainian defendants' own commercial activity as alleged in the complaint as carried on or creating an effect in the United States.

### III. Conclusion

We conclude that the district court did not err when it denied the Ukrainian defendants' motion to dismiss UTICo's breach of contract claim under the commercial activity exception to foreign sovereign immunity. Accordingly, the decision of the district court is affirmed.

**Affirmed.**